## UNITED STATES v. WRIGHTWOOD DAIRY CO.*

No. 744.   Argued January 14, 1942.—Decided February 2, 1942.

---

\* Together with No. 783, *Wrightwood Dairy Co.* v. *United States,* also on writ of certiorari, 314 U. S. 605, to the Circuit Court of Appeals for the Seventh Circuit.

*Mr. Alvin E. Stein* for Wrightwood Dairy Company, respondent in No. 744 and cross-petitioner in No. 783.

112

*Mr. John S. L. Yost,* with whom *Solicitor General Fahy, Assistant Attorney General Arnold,* and *Messrs. Robert L. Stern, James C. Wilson,* and *Miss Margaret H. Brass* were on the brief, for the United States.

114

MR. CHIEF JUSTICE STONE delivered the opinion of the Court.

The principal questions for our decision are whether certain price regulation by the Secretary of Agriculture of milk produced and sold intrastate is authorized by the

116

provisions of the Agricultural Marketing Agreement Act of June 3, 1937, 50 Stat. 246, 7 U. S. C. § 608c, and is a permissible regulation under the commerce clause of the Constitution.

Section 8c of the Act authorizes the Secretary of Agriculture to issue marketing orders fixing minimum prices to be paid to producers of milk and certain other commodities. Paragraph 1 of the section provides that orders of the Secretary "shall regulate, in the manner hereinafter in this section provided, only such handling of such agricultural commodity, or product thereof, as is in the current of interstate or foreign commerce, or which directly burdens, obstructs, or affects, interstate or foreign commerce in such commodity or product thereof."

The United States sought in the present suit a decree directing respondent to comply with the Secretary's Order No. 41, of August 28, 1939, regulating the handling of milk in the "Chicago, Illinois, marketing area." Respondent is a handler in that area of milk which it purchases from producers in Illinois. The order, which is of the type described in the opinion of this Court in *United States* v. *Rock Royal Co-operative*, 307 U. S. 533, 551–555, is by its terms applicable to respondent, and purports to carry out the statutory scheme for regulating the price of milk paid to producers considered in the opinion in that case. By the order the Secretary found that all milk produced for sale in the marketing area "is handled in the current of interstate commerce, or so as directly to burden, obstruct, or affect interstate commerce in milk or its products . . . ," and directed that it apply to such "handling of milk" in the marketing area "as is in the current of interstate commerce, or which directly burdens, obstructs, or affects interstate commerce."

The order, as provided by the statute, § 8c (5), classifies milk according to its uses, and establishes a formula for determining the minimum price to be paid to producers

for each class of milk. It prescribes the method of determining the value of milk received from producers by each handler during each month. It requires the payment of a uniform unit price to producers, computed by dividing the total value of milk reported by all handlers in the marketing area by the total quantity of such milk, with deductions of certain amounts to provide a cash balance in a "producer-settlement fund." The handler is required to pay producers the uniform price, subject to butterfat and location differentials. But he is also required to pay into the settlement fund, or permitted to withdraw from it, as the case may be, certain amounts, depending on whether the total value of the milk used by him is greater, or less, respectively, than his total payments to producers at the uniform price. The amounts withdrawn from the settlement fund by handlers are required to be used to bring the price received by certain producers up to the uniform price set in the order, where, because of the purpose for which the handler has sold it, the value of their milk is less than the uniform price. Handlers are required to make reports to the Administrator containing information necessary for the execution of the order and to bear the expense of administering it.

Respondent's answer in the District Court sets up that its business is entirely intrastate, and that, in consequence, the statute does not, and under the commerce clause can not constitutionally, apply to it. The answer also sets up additional grounds, which need not now be considered, for respondent's contention that the order is invalid, and by way of counterclaim prays that the United States and its officers and agents be enjoined from enforcing the order. The court found that respondent had not complied with the order; that in the course of its business it purchases milk from producers within the State of Illinois, processes the milk and sells it in the state "in competition with the milk of other handlers in the area"; that

none of respondent's milk is physically intermingled with that which has crossed state lines; and that, prior to the order, 60 per cent of the milk sold in the marketing area was produced in Illinois and 40 per cent in neighboring states, and that at the time of the findings "over 60 per cent" was produced in Illinois. The record shows that "approximately 40%" comes from without the state.

The court held that "the order was issued by the Secretary in full compliance with the law. All conditions precedent to the effectiveness of said order have occurred," but that the business of the defendant "was not in the current of interstate . . . commerce, and did not directly burden, obstruct or affect interstate . . . commerce in milk marketed within the Chicago, Illinois, marketing area." It accordingly decreed that the complaint be dismissed, and granted the injunction prayed by the counterclaim.

The Circuit Court of Appeals affirmed, 123 F. 2d 100, on the sole ground that Congress is without authority under the commerce clause to regulate intrastate transactions in milk which affect interstate commerce through competition only. It recognized that respondent's milk is sold in competition with other milk moving interstate; that the "milk problem is a serious one and apparently for the most effective control requires unified regulations," and that if respondent is not subject to the present regulations is "may well be that the effective sanction of the order will wither before the force of competition, the morale of the market will disintegrate, and this attempt at solution of the problem by the National Government will fail." But it concluded that there is a hiatus between the constitutional power of State and Nation which precludes any solution of the problem by Congressional legislation.

We think there is no such hiatus. Congress plainly has power to regulate the price of milk distributed through the medium of interstate commerce, *United States* v. *Rock Royal Co-operative, supra,* and it possesses every power

needed to make that regulation effective. The commerce power is not confined in its exercise to the regulation of commerce among the states. It extends to those activities intrastate which so affect interstate commerce, or the exertion of the power of Congress over it, as to make regulation of them appropriate means to the attainment of a legitimate end, the effective execution of the granted power to regulate interstate commerce. See *McCulloch* v. *Maryland,* 4 Wheat. 316, 421; *United States* v. *Ferger,* 250 U. S. 199; *Consolidated Edison Co.* v. *National Labor Relations Board,* 305 U. S. 197, 221; *United States* v. *Darby,* 312 U. S. 100, 118–19. The power of Congress over interstate commerce is plenary and complete in itself, may be exercised to its utmost extent, and acknowledges no limitations other than are prescribed in the Constitution. *Gibbons* v. *Ogden,* 9 Wheat. 1, 196. It follows that no form of state activity can constitutionally thwart the regulatory power granted by the commerce clause to Congress. Hence the reach of that power extends to those intrastate activities which in a substantial way interfere with or obstruct the exercise of the granted power.

Familiar examples are the Congressional power over commodities inextricably commingled, some of which are moving interstate and some intrastate, see *United States* v. *New York Central R. Co.,* 272 U. S. 457, 464; the power to regulate safety appliances on railroad cars, whether moving interstate or intrastate, *Southern Ry. Co.* v. *United States,* 222 U. S. 20; the power to control intrastate rates of a common carrier which affect adversely federal regulation of the performance of its functions as an interstate carrier, *Shreveport Case,* 234 U. S. 342; *Railroad Commission of Wisconsin* v. *Chicago, B. & Q. R. Co.,* 257 U. S. 563; the regulation by the Tobacco Inspection Act of tobacco produced intrastate and destined to consumers within the state as well as without, *Currin* v. *Wallace,* 306 U. S. 1; the regulation of both interstate and intrastate marketing of

tobacco under the Agricultural Adjustment Act, *Mulford* v. *Smith,* 307 U. S. 38, 47; and see cases collected and discussed in *United States* v. *Darby,* 312 U. S. 100, 118–125.

Competitive practices which are wholly intrastate may be reached by the Sherman Act because of their injurious effect on interstate commerce. *Northern Securities Co.* v. *United States,* 193 U. S. 197; *Swift & Co.* v. *United States,* 196 U. S. 375; *United States* v. *Patten,* 226 U. S. 525; *Coronado Coal Co.* v. *United Mine Workers,* 268 U. S. 295; *Local 167* v. *United States,* 291 U. S. 293; *Stevens Co.* v. *Foster & Kleiser Co.,* 311 U. S. 255. So too the marketing of a local product in competition with that of a like commodity moving interstate may so interfere with interstate commerce or its regulation as to afford a basis for Congressional regulation of the intrastate activity. It is the effect upon the interstate commerce or its regulation, regardless of the particular form which the competition may take, which is the test of federal power. Cf. *Shreveport Case, supra; Railroad Commission of Wisconsin* v. *Chicago, B. & Q. R. Co., supra; National Labor Relations Board* v. *Jones & Laughlin Corp.,* 301 U. S. 1, 36–43; *United States* v. *Darby, supra,* 122.

As the court below recognized, and as seems not to be disputed, the marketing of intrastate milk which competes with that shipped interstate would tend seriously to break down price regulation of the latter. Under the conditions prevailing in the milk industry, as the record shows, the unregulated sale of the intrastate milk tends to reduce the sales price received by handlers and the amount which they in turn pay to producers. Study of the order which we have summarized makes clear that the unregulated handler selling fluid milk can pay producers substantially less than the minimum price set in the order for milk of that class, and yet pay as much as, or more than, the "uniform price" prescribed by the regulatory scheme for all pro-

ducers, which is based upon the average price for the several classes of milk combined. Such a handler would have an advantage over others in the sale of the class of milk in which he principally deals, and could force his competitors dealing in interstate milk to surrender the market or seek to reduce prices to producers in order to retain it.

It is no answer to suggest, as does respondent, that the federal power to regulate intrastate transactions is limited to those who are engaged also in interstate commerce. The injury, and hence the power, does not depend upon the fortuitous circumstance that the particular person conducting the intrastate activities is, or is not, also engaged in interstate commerce. See *Chicago Board of Trade* v. *Olsen*, 262 U. S. 1; *Stevens Co.* v. *Foster & Kleiser Co.*, *supra*. It is the effect upon interstate commerce or upon the exercise of the power to regulate it, not the source of the injury which is the criterion of Congressional power. *Second Employers' Liability Cases*, 223 U. S. 1, 51. We conclude that the national power to regulate the price of milk moving interstate into the Chicago, Illinois, marketing area, extends to such control over intrastate transactions there as is necessary and appropriate to make the regulation of the interstate commerce effective; and that it includes authority to make like regulations for the marketing of intrastate milk whose sale and competition with the interstate milk affects its price structure so as in turn to affect adversely the Congressional regulation.

We turn to the question whether Congress has exercised that authority by § 8c (1). Respondent argues that Congress, in enacting it, did not intend to exercise its full power over commerce, and that read in the light of its legislative history the section does not authorize the regulation of competing intrastate milk. In terms the statute speaks of the handling of products "in the current of interstate commerce" or "which directly burdens, obstructs, or af-

fects, interstate commerce." The argument is that the word "directly" in the statute is restrictive, evidencing an intention to exercise less than the full authority possessed by Congress, and a purpose not to extend that authority to the regulation of local products which affect the interstate commodities and their regulation only by competing with them.

In support of this contention respondent points to the precursor of the present statute, the Agricultural Adjustment Act of 1933, 48 Stat. 31, 35, as amended by 48 Stat. 528, which contained provisions omitted from the present statute, specifically authorizing certain regulation of products "in competition with" those in interstate commerce. Section 8 (2) of the 1933 Act, as amended, authorized the Secretary to enter into marketing agreements with those "engaged in the handling of any agricultural commodity or product thereof, in the current of or in competition with, or so as to burden, obstruct, or in any way affect, interstate or foreign commerce." And § 8 (3) provided for the issuing of licenses to those engaged "in the handling, in the current of interstate or foreign commerce, of any agricultural commodity or product thereof, or any competing commodity or product thereof." In the 1935 amendments to the Agricultural Adjustment Act these provisions were replaced by the phraseology which was taken over without change into § 8c (1) of the Agricultural Marketing Agreement Act of 1937, already quoted. Hence it is to the legislative history of the 1935 amendments that we must turn to ascertain the significance of the phrase, "directly affects" interstate commerce, which then appeared in the statute for the first time.

The bills providing for the 1935 amendments, as introduced, eliminated the differences between § 8 (2) and § 8 (3) of the 1933 Act, as amended, and authorized the Secretary to issue licenses to those "engaged in the handling of any agricultural commodity or product thereof, or any

competing commodity or product thereof, in the current of or in competition with or so as to burden, obstruct, or in any way affect, interstate or foreign commerce." S. 1807, H. R. 7713 and 8052, 74th Cong., 1st Sess. In the reports of the House and Senate Committees on Agriculture, it was pointed out that although "the full extent of the Federal power over interstate commerce is intended to be vested in the Secretary," it was "not intended to authorize the licensing of persons handling goods only in intrastate commerce except where such handling burdens, obstructs, or affects interstate commerce." S. Rep. No. 548, p. 6, H. Rep. No. 808, p. 5, H. Rep. No. 952, p. 5, 74th Cong., 1st Sess.

These bills were pending in Congress when *Schechter Corp.* v. *United States,* 295 U. S. 495, was decided on May 27, 1935. In consequence of that decision a new bill, H. R. 8492, was reported out which superseded the pending bills and eventually became the Act of 1935. The new bill, in terms, permitted the Secretary to regulate the handling of products which "directly affects" interstate commerce. As the legislative history demonstrates, this phraseology was deliberately chosen to conform to that adopted in the opinion in the *Schechter* case, as signifying the full reach of the commerce power, and with the avowed purpose of conferring on the Secretary authority over intrastate products to the full extent of that power. See 79 Cong. Rec. 9478 and S. Rep. No. 1011, p. 8, H. Rep. No. 1241, p. 8, 74th Cong., 1st Sess.

In the *Schechter* case the Court was concerned only with the alleged infringements of the "Code of Fair Competition" for the live poultry industry of the New York City metropolitan area, which had been adopted under the provisions of § 3 of the National Industrial Recovery Act of June 16, 1933, 48 Stat. 195, 196. The violations of the code charged were that wholesale distributors who had purchased poultry in New York, most

of which came from without the state, and who were engaged in slaughtering and reselling to retailers, had failed to maintain for their employees wages and hours prescribed by the code, and had failed to abandon "selective selling" to their customers in New York which the code had prohibited.

The Court's opinion pointed out that the defendants were not charged with injury to interstate commerce or interference with persons engaged in that commerce, and that the acts charged had no different relation to or effect upon interstate commerce than like acts in any other local business which handles commodities brought into the state. *Schechter Corp.* v. *United States, supra,* 545–6. It characterized their effect upon interstate commerce as "indirect," and distinguished them from those acts and transactions intrastate which, because they "directly affect" interstate commerce, are within the Congressional regulatory power. In explanation of this distinction and as examples of direct effects which are within the commerce power it referred to the "fixing of rates for intrastate transportation which unjustly discriminate against interstate commerce," citing the *Shreveport Case, supra,* and referred to intrastate restraints upon competition injuriously affecting interstate commerce condemned by the Sherman Act, citing *Local 167* v. *United States, supra,* and other cases.

In adopting the change in the new bill, giving to the Secretary the authority to regulate the handling of products "directly affecting" interstate commerce, and in deleting the phrase "in competition with" interstate commerce, the House and Senate Committees on Agriculture, after referring to the *Schechter* case stated: "This phrase has been omitted from the proposed section 8c (1) of the bill which deals with orders . . . because the proposed language makes it clear that the full extent of the Federal power over interstate and foreign commerce and no more

is intended to be vested in the Secretary of Agriculture in connection with orders." See S. Rep. No. 1011, p. 9; H. Rep. No. 1241, p. 8, 74th Cong., 1st Sess.

The same interpretation of the amendments was given by the Committee representative charged with explaining them on the floor of the Senate, who declared, 79 Cong. Rec. 11139, "The position of the committee in respect to these amendments is that intrastate commerce may burden or affect interstate commerce and that consequently this is a constitutional enactment under the decision of the Court in the Shreveport case." The House debates also disclose general recognition that the bill as amended was intended to be a full exercise of the federal power over competing intrastate milk. 79 Cong. Rec. 9479–9480, 9485.

The opinions of some members of the Senate,[1] conflicting with the explicit statements of the meaning of the statutory language made by the Committee reports and members of the Committees on the floor of the Senate and the House, are not to be taken as persuasive of the Congressional purpose. Cf. *United States* v. *Trans-Missouri Freight Assn.*, 166 U. S. 290, 318. Moreover, other Senators, not members of the Committee on Agriculture, accepted its views of the extent to which the federal power was to be exerted by the proposed legislation.[2]

We think it clear that Congress, by the provisions of § 8c (1), conferred upon the Secretary authority to regulate the handling of intrastate products which by reason of its competition with the handling of the interstate milk so affects that commerce as substantially to interfere with its regulation by Congress; and that the statute so read is a constitutional exercise of the commerce power. Such was the view expressed in *United States* v. *Rock Royal*

[1] 79 Cong. Rec., 11135–6.
[2] 79 Cong. Rec., 11134–9.

*Co-operative, supra,* 307 U. S. at 568. We adhere to that opinion now.

The judgment will be reversed, but, as errors assigned below have not been passed on there or argued here, the cause will be remanded to the Circuit Court of Appeals for further proceedings in conformity with this opinion. The mandate will issue forthwith.

*Reversed.*

Mr. Justice Roberts took no part in the consideration or decision of this case.

