289 F.2d 343
 UNITED STATES of America, Appellant,
v.
40 CASES, MORE OR LESS OF Six One Gallon Cans Article
Labeled in Part (Can) PINOCCHIO BRAND 75% CORN, PEANUT OIL
AND SOYA BEAN OIL BLENDED WITH 25% PURE OLIVE OIL-- Packed
by A.M.S. Packing Company, New York-- at Syracuse, New Yrok,
A.M.S. Packing Co., Appellee.
 No. 295, Docket 26724.
 United States Court of Appeals Second Circuit.
 Argued Feb. 10, 1961.
Decided April 19, 1961.
 
 William W. Goodrich, Asst. Gen. Counsel, U.S. Dept. of Health, Education & Welfare, Washington, D.C. (Theodore F. Bowes, U.S. Atty., Northern Dist. of New York, Syracuse, N.Y., Sydney Brodie, Duane L. Nelson, Dept. of Justice, Washington, D.C., Joanne S. Sisk, U.S. Dept. of Health, Education & Welfare, Washington, D.C., on the brief), for appellant.
 Julius Zizmor, New York City for appellee.
 Before LUMBARD, Chief Judge, MADDEN, Judge, United States Court of Claims,[1] and WATERMAN, Circuit Judge.
 LUMBARD, Chief Judge.
 
 
 1
 The single question before us on this appeal is whether 304(a) of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C.A. 334(a), authorizes the United States to proceed against and seize mislabeled or adulterated cans of blended vegetable oils mixed entirely within the State of New York from various oils shipped under proper labels from other states and foreign countries. Section 304(a) permits seizure of food which is 'adulterated or misbranded when introduced into or while in interstate commerce or while held for sale (whether or not the first sale) after shipment in interstate commerce. * * *' The district judge held that the blended oil was a 'new product' and therefore not the same as those shipped in interstate commerce. He dismissed the libel. D.C.N.D.N.Y.1960, 188 F.Supp. 290.
 
 
 2
 In its libel, the allegations of which must be taken as true on review of the decision to dismiss, the United States charged that forty cases of six one-gallon cans of 'pinocchio' brand oil were delivered to the La Gondola Food Corporation in Syracuse; that they were being held for sale after interstate shipment; that the cans were labeled '25 per cent pure olive oil'; that examination showed that the cans contained little or no olive oil; and that the oil was therefore 'adulterated' within the meaning of 402(b)(2) or 'misbranded' within the meaning of 403(a) of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C.A. 342(b)(2), 343(a).
 
 
 3
 An answer to the libel was filed by the A.M.S. Packing Company, which alleged that it had blended and packed the oil attached under the libel; that the blend was as represented on the labels of the cans; and that all steps in the manufacturing and/or blending of the oils had taken place within the State of New York. On the basis of its allegation that the blending had been done in New York, the company put in issue the jurisdiction of the federal court and moved to dismiss the libel.
 
 
 4
 The United States did not in the district court or here challenge the truth of the company's assertion that the blending process was done entirely within the State of New York, nor did it claim that the blended oil was carried across any state line. It is also undisputed that the various oils from which the blend was made had been shipped under proper labels from New Jersey, Illinois and Georgia, and that olive oil had been transported to the company's plant in Ozone Park, New York, from Spain, Italy and Tunisia. The United States contends that although the component oils were correctly labeled when shipped interstate, the misbranding or adulteration which occurred during or after the blending of the oils brought them within the compass of the federal act as articles of food held for sale after interstate shipment.
 
 
 5
 From 1938 to 1948, the Food, Drug, and Cosmetic, Act provided for condemnation of articles of food that were adulterated or misbranded only 'when introduced into or while in interstate commerce.' This language was held not to authorize seizure of food that was pure and properly labeled while in interstate commerce and became adulterated or misbranded only after the interstate voyage had been completed. United States v. Phelps Dodge Mercantile Co., 9 Cir., 1946, 157 F.2d 453, certiorari denied 1947, 330 U.S. 818, 67 S.Ct. 675, 91 L.Ed. 1270. In 1948, however, Congress amended 304(a) so as also to permit seizure of food that is adulterated or misbranded 'while held for sale (whether or not the first sale) after shipment in interstate commerce.' 62 Stat. 582. Had the company in this case not mixed the oils it received from various sources but instead pasted new misleading labels on the containers in which they were shipped in interstate commerce or otherwise adulterated the oils, seizure would have been authorized. The appellee would have us hold here that the blending of the oils which had been transported in interstate commerce took the final product out from under federal regulation although each of its separate components was being held for sale after shipment in interstate commerce. We do not agree.
 
 
 6
 The original Food and Drugs Act of 1906 authorized seizure only if the adulterated or misbranded food or drug was being transported in interstate commerce, 'or, having been transported, remains unloaded, unsold, or in original unbroken packages.' 10, 34 Stat. 771, 21 U.S.C.A. 14. The 'original package' limitation was omitted when the Food, Drug, and Cosmetic Act of 1938 supplanted the prior law. The appellee cannot, therefore, prevail here on the theory that the oil seized was not in the same container as was used for its shipment in interstate commerce.
 
 
 7
 The appellee contends that the packing company here did more than merely break open the original package. It argues that the processing of the oils in Ozone Park, New York, created a new product-- a blend of many different vegetable oils-- which was not the same as the food transported in interstate commerce and therefore could not be seized as food held for sale after shipment in interstate commerce. We disagree.
 
 
 8
 In enacting the 1948 amendment to the Pure Food, Drug, and Cosmetic Act, Congress sought to fill the gap in the regulatory scheme pointed out in United States v. Phelps Dodge Mercantile Co., supra, by subjecting to condemnation food which had been adulterated or misbranded after coming to rest within a state but before being sold to a consumer. The interest of the federal government in ensuring that such food meets mimimum standards of purity and is not misbranded arises out of its supervisory function over interstate commerce. The House and Senate reports both referred expressly to the Congressional desire to protect the integrity of interstate products so as not to depress the demand for goods that must travel across state lines. See H.R.Rep.No.807, 80th Cong. 1st Sess. 4-5 (1947); S.Rep.No.1221, 80th Cong. 2d Sess. 3-4 (1948). This interest surely extends to products such as olive oil, which a New York consumer would probably recognize as out-of-state of foreign in origin.
 
 
 9
 Moreover, in this case all the components of the oil blend had been transported in interstate commerce, and the completed mixture was being held for sale as 'oil'-- the very same type of food which had traveled across the state line. This is not a case in which oil which was transported interstate was used as one of many ingredients in a finished product which in no way resembled the food which had crossed state lines. Oil may come in many varieties, but to the unsophisticated consumer one oil blend is much like another. We would be undermining the remedial legislative purpose of consumer protection were we to deny the power to seize misbranded articles on the ground that such foods as corn oil, peanut oil, soya bean oil and olive oil when mixed constitute a 'different product' from a blend of less than all or from a pure measure of any one of them. Cf. United States v. Urbuteit, 1948, 335 U.S. 355, 357-358, 69 S.Ct. 112, 93 L.Ed. 61.
 
 
 10
 The appellee relies heavily, as did Judge Foley in dismissing the libel, on United States v. An Article or Device Consisting of 31 Units (Gonsertron), D.C.E.D.Mich.1959, 180 F.Supp. 52. That case has been limited considerably by a more recent decision by the same district judge. See United States v. An Article of Drug Consisting of 39 Cases (Korleen), D.C.E.D.Mich.1961, 192 F.Supp. 51. In any event, the Gonsertron case is distinguishable since the misleading aspect of the pamphlets which accompanied the condemned device related there to remedial qualities purportedly possessed by one entire apparatus, which had been assembled wholly within the State of Michigan. None of the separate components which had been transported in interstate commerce was misbranded; it was the labor of assembling the components, which when assembled purportedly constituted an electrotherapy device, which was misrepresented. Here, however, the misbranding related directly to the percentage content of the olive oil shipped in interstate commerce. Congress' policy may not extend to assuring a consumer that all representations regarding any device or food made up of components transported in interstate commerce are true, but it at least goes so far as to assure him that the interstate elements themselves are not misrepresented.
 
 
 11
 Congress surely intended the provisions of the Food, Drug, and Cosmetic Act to apply to foods processed within a state, after shipment in interstate commerce, as was the case here. The statute must be read and applied broadly in order to effectuate its remedial purpose. Cf. Kordel v. United States, 1948, 335 U.S. 345, 349, 69 S.Ct. 106, 93 L.Ed. 52. We have no doubt of the power of Congress so to protect the public with respect to foodstuffs which have been shipped in interstate and foreign commerce, see Hipolite Egg Co. v. United States, 1911, 220 U.S. 45, 57-58, 31 S.Ct. 364, 55 L.Ed. 364; cf. United States v. Kahriger, 1953, 345 U.S. 22, 29-30 n. 6, 73 S.Ct. 510, 97 L.Ed. 754, and we reverse the order of the district court dismissing the libel.
 
 
 
 [1]
 Sitting by designation