UNITED STATES of America,
Libelant-Appellee,

v.

DETROIT VITAL FOODS, INC.,
Claimant-Appellant.

No. 15287.

United States Court of Appeals
Sixth Circuit.

March 31, 1964.

Milton A. Bass, New York City, Bass & Friend, New York City, on brief, for appellant.

William R. Pendergast, Washington, D. C., Herbert J. Miller, Asst. Atty. Gen., Lawrence Gubow, U. S. Atty., Milton J. Trumbauer, Jr., Asst. U. S. Atty., Detroit, Mich., on brief; Harold W. Horowitz, Associate General Counsel, Joanne S. Sisk, Attorney, Department of Health, Education and Welfare, Washington, D. C., of counsel, for appellee.

Before MILLER and CECIL, Circuit Judges, and McALLISTER, Senior Circuit Judge.

McALLISTER, Senior Circuit Judge.

The government filed a Libel of Information under the Federal Food, Drug and Cosmetic Act (21 U.S.C.A. § 301 et seq.), alleging that articles in the possession of Detroit Vital Foods, Inc., and known as "Michigan Brand Korleen Tablets" and "Lelord Kordel's 'Frutex' Fruit Salad and Vital Foods * * * 'Frutex' Fruit Salad" were drugs which were misbranded while held for sale after shipment in interstate commerce.

The Libel alleged that the drugs were misbranded in that the labeling contained false and misleading representations that the drugs were an adequate and effective treatment for hardening of the arteries, defatting of the liver, coronary attacks, cirrhosis of the liver, varicose veins, sore throat, arthritis, drainage of the eyes, inflammation of the eyes, swelling of joints, degeneration of the liver, gall bladder distress, high blood pressure, premature aging, brain fag, prevention of air and foodborne poisonings, impaired circulation, bleeding gums, soft gums, receding gums, nose bleeding, bloodshot eyes, capillary fragility, fever, aches and pains of fever, common colds, fatigue, alcoholism, loose teeth, sneezing, pyorrhea, fibroid tumors of the uterus, brown pigmentation spots on the skin, prostate gland trouble, prevention of old age, hold-

ing of cells together, neutralizing the effect of cigarette smoke, preventing blood vessels and capillaries from bursting, preventing cells within the retina from breaking down, improving the condition of the blood vessels, and neutralizing the toxins in aspirin tablets.

The labeling which the government complained of, as misbranding, was stated to have been contained in leaflets accompanying the drugs, and lectures offered by Lelord Kordel, President of the Detroit Vital Foods, Inc., in promoting sales of the articles; and the government charged that the labeling failed to bear adequate directions for use for the purposes for which the drugs were intended, and that it was misleading and false, all in violation of the Federal Food, Drug and Cosmetic Act, above mentioned. The drugs and literature, used in connection with their proposed sale, were seized by the United States Marshal, pursuant to monition issued out of the District Court.

Mislabeling and misbranding are perils to the public to which many of the provisions of the Federal Food, Drug and Cosmetic Act are directed. The dangers of misrepresentations in literature accompanying drug products, such as in this case, have nowhere been pointed out so well as in the case of United States v. Kordel, 164 F.2d 913, 916, 917 (C.A.7), where the president of the claimant company, in the instant case, was defendant. The court, in upholding his conviction, said:

"With respect to the misrepresentations contained in the accompanying literature we think there can be no serious question. The two booklets, 'Nutrition Guide,' and 'What you can do about relieving the agonies of Arthritis' were written by appellant who, in the latter, is described as 'America's leading vitamin and diet expert.' 'Health Today, Spring 1945,' is edited by the same 'famous nutrition and vitamin authority.' While all purport to be scientific publications of general interest apart from the articles produced and marketed by appellant, written by an expert in the field, in fact, all are replete with references to the Kordel products and their uses to prevent, ameliorate or cure a vast and diverse variety of ailments, and each conveniently closes with a price list of the various Kordel products recommended for use therein. All are concerned primarily with promoting the sale of the various products by explaining the need for each, along with extravagant claims as to the usefulness of each. A study of the three pamphlets reveals that the products therein described are recommended for relieving stomach agonies, general weakness, anemia, premature old age, high blood pressure, liver troubles, failing eyesight, sore feet; maintaining blood energy, muscular activity, sound teeth and gums, healthy skin, hair and eyes, normal functioning of the pituitary and thyroid glands, stomach, intestines, colon, liver and kidneys; and preventing arthritis and stiff joints, excess weight, catarrh, nervous breakdown, sterility, and paralysis.

"Thus the scheme devised by appellant for the distribution of his products and related literature contemplates an elaborate system of self-diagnosis and medication. The danger inherent in this system lies not in any positive unwholesomeness of the articles themselves. As to them as such there is no charge and it may be that they are quite harmless in and of themselves. The danger however, lies in the fact that ignorant and gullible persons are likely to rely upon them instead of seeking professional advice for conditions they are represented to relieve or prevent. The Government introduced the evidence of many very eminent men in the medical profession to prove the dangerously misleading character of the literature in that the drugs were useless to combat the conditions they were represented to relieve, while delay in cor-

rect diagnosis and treatment for those conditions might render treatment useless. As one of them stated, the literature encouraged people to experiment with themselves and that meant they were gambling with their health and life. He branded as scientifically ridiculous and nonsensical various of the claims and, when asked whether he would say that the products in themselves were harmful, replied, 'They are definitely harmful in that they encourage a patient with a serious disease to experiment with himself when he should seek medical advice and precise diagnosis and therapy.'

"All were agreed that while the claims were absurd and fantastic, they were dangerous in that they tended to lull people into a false sense of security in reliance on the drugs when they might need professional diagnosis and treatment for conditions which might respond to treatment if correctly diagnosed early enough, but which might become much more serious if not taken care of early. Since the literature which we have already held accompanied the products embodies such misleading representations, it constitutes misbranding within the meaning of the Act."

After numerous pleadings, motions, interrogatories, amendments, objections, and hearings, a consent decree of condemnation was ordered by the District Court. This consent decree is unusual in that it states that the claimant, Detroit Vital Foods, Inc., in consenting to the entry of the decree, specifically reserves "its right to appeal the ruling of the Court herein on the jurisdictional question pertaining to the Korleen tablets." The consent decree adjudged that the drug "Korleen" was misbranded while held for sale after shipment in interstate commerce, in violation of Title 21 U.S. C.A. §§ 352(a) and 352(f) (1); and that the article of food and drug, "Vital Foods Special Brand 'Frutex' Fruit Salad" was misbranded when introduced thereto, while in, and while held for sale after shipment in interstate commerce, in violation of Title 21 U.S.C.A. §§ 343(a), 343(i) (2), 352(a), and 352(f) (1). The articles were, therefore, condemned, pursuant to Title 21 U.S.C.A. § 334(a). The consent decree further ordered that the United States Marshal destroy all literature seized with the drug products, except two books, "Eat and Grow Younger," and "How to Make People Like You."

The court, however, decreed that the Marshal should release the seized drugs to the custody of claimant for the purpose of bringing the articles into compliance with the provisions of the Federal Food, Drug and Cosmetic Act, upon claimant's giving a bond conditioned that it would so do. It was further decreed that, after filing the bond, the claimant should give written notice to the Food and Drug Administration of the Department of Health, Education and Welfare that it was prepared to bring said articles into compliance with the Act, under the supervision of a duly-authorized representative of the Secretary of such Department; and that the claimant should, at all times and until the articles had been released by a duly-authorized representative of the Secretary, retain the articles for examination or inspection by such representative and should maintain records or other proof necessary to identify such articles to his satisfaction. The court further ordered that the claimant should, under no circumstances, sell or dispose of the articles until the representative of the Secretary had made what examinations were deemed necessary and, in writing released the articles for shipment, sale, or other disposition.

Upon the entry of the decree, the claimant, Detroit Vital Foods, Inc., filed its appeal to this Court: "from so much of the final decree and judgment entered * * * as condemns * * * 'Michigan Brand Korleen' Tablets," and which adjudged that the article was misbranded while held for sale after shipment in interstate commerce within the meaning of the Federal Food, Drug and Cosmetic Act.

As heretofore mentioned, the consent decree provided that the right was specifically reserved to claimant "to appeal the ruling of the Court herein on the jurisdictional question pertaining to the Korleen tablets."

■ This "jurisdictional question" is found in the proceedings in the case wherein claimant made a motion for a partial summary judgment, which was denied by the District Court in an opinion and formal order. The claimant had contended that the government had no jurisdiction to seize the drugs for misbranding while being held for sale after shipment in interstate commerce, because the drug seized was a new compound manufactured in the State of Michigan and had not theretofore been shipped in interstate commerce. The fact that the drug in question had been manufactured by mixing several other drugs shipped in interstate commerce did not result, according to the claimant, in the new mixture's being a drug held for sale after shipment in interstate commerce.

The question for determination is whether the ingredients of the Korleen tablets, which was the drug seized, lose their identity as individual components when combined to form such tablets. As Judge Levin found, in the District Court: "Five of the six active ingredients of Korleen Tablets, choline, inositol, methionine, niacinamide, and thiamine, are 'drugs,' being listed in the official United States Pharmacopoeia or the official National Formulary. The representations in leaflets circulated in connection with the sale of the product also demonstrate that the Tablets are a 'drug' within * * * the statutory definition."

The claimant contends that the active ingredients lose their identity as individual components, when combined to form Korleen tablets. One of the leaflets circulated in connection with the sale of the seized product emphasized that choline was a most interesting and valuable vitamin, and went on to tell what choline tends to do in helping many physical afflictions such as fatty liver and fatted ar-

teries, and suggested that choline is a remedy for such arteries, and for hardened cerebral arteries. The leaflet further stated that Korleen "is the name of a wonderful new product containing large amounts of Choline—combined with Inositol, Methionine, etc." It further declares that "it is wise to add really high amounts of Choline—Inositol—Methionine to supplement our daily diet." The value of each of the ingredients making up Korleen tablets is emphasized. These ingredients are, so to speak, put in a package together. In their combination, they do not form something new and different. As far as can be perceived from the representations made to the public, the ingredients are mixed and pressed into tablets which offer several different drugs in one dose. The case is similar to United States v. 40 Cases * * * Pinocchio Brand, 289 F.2d 343, 346 (C.A.2), where several different vegetable oils were combined. It was argued that such processing created a new product which was different from the ingredient oils that had been shipped in interstate commerce. The court overruled this contention saying:

"We would be undermining the remedial legislative purpose of consumer protection were we to deny the power to seize misbranded articles on the ground that such foods as corn oil, peanut oil, soya bean oil and olive oil when mixed constitute a 'different product' from a blend of less than all or from a pure measure of any one of them."

■ Finally, claimant contends that the seizure provisions of the Federal Food, Drug and Cosmetic Act, as interpreted by the District Court, are unconstitutional. The argument reverts to the claim that "Korleen Tablets" constitute a new product different in kind and nature from the ingredient drugs and that consequently since "Korleen Tablets" do not move in interstate commerce, they are not subject to seizure under the Act. It is urged that while the ingredient drugs did move in interstate commerce, they were not claimed to have been mis-

branded. These ingredient drugs, however, when combined in Detroit, were misbranded. The statutory purpose of the Act was "to safeguard the consumer by applying the Act to articles from the moment of their introduction into interstate commerce all the way to the moment of their delivery to the ultimate consumer. * * * The words * * * 'while such article is held for sale after shipment in interstate commerce' apparently were designed to fill this gap and to extend the Act's coverage to every article that had gone through interstate commerce until it finally reached the ultimate consumer." United States v. Sullivan, 332 U.S. 689, 696, 697, 68 S.Ct. 331, 335, 336, 92 L.Ed. 297. As Mr. Justice Black said, in speaking for the court in the above-mentioned case, the "purpose [of the Act] would be frustrated when the pills the consumer buys are not labeled as required, whether the label has been torn from the original container or the pills have been transferred from it to a non-labeled one." Supra, 332 U.S. 695, 68 S.Ct. 335, 92 L.Ed. 297. So, the removal of drugs from a container, labeled in accordance with requirements of the Act, to one not so labeled, is the doing of an act which results in their being "misbranded" within the meaning of Section 301(k). As Judge Levin, in the District Court, remarked: "The Supreme Court has warned against creating 'loopholes,' at the expense of public protection, through restrictive or technical constructions of the Act. See Kordel v. United States, 335 U.S. 345, 349, [69 S.Ct. 106, 93 L.Ed. 52] (1948); United States v. Urbuteit, 335 U.S. 355, 357–358, [69 S. Ct. 112, 93 L.Ed. 61] (1948)."

It is our view that by misbranding "Korleen Tablets," made from ingredient drugs that had been properly labeled in the course of interstate commerce, the misbranding came within the prohibitory provisions of the Federal Food, Drug and Cosmetic Act.

In accordance with the foregoing, the judgment of the District Court is affirmed.