**UNITED STATES of America,
Plaintiff,**

v.

**DIANOVIN PHARMACEUTICALS, INC.,
a .corporation, and Nicolas O. Cabrero
Oronoz, an individual, Defendants.**

**Civ. No. 43–69.**

United States District Court,
D. Puerto Rico.

May 1, 1972.

Julio Morales Sanchez, U. S. Atty., and Wally de la Rosa, Asst. U. S. Atty., San Juan, P. R., John C. Young, Gen. Counsel, H. E. W., Washington, D. C., for plaintiff.

Frank Carbo, Santurce, P. R., for defendants.

## ORDER

TOLEDO, District Judge.

On February 17, 1969, this Court granted an Order of Permanent Injunction against Dianovin Pharmaceuticals, Inc. and Nicolás O. Cabrero Oronoz, defendants in the present proceeding, generally prohibiting defendants from manufacturing or introducing into interstate commerce drugs manufactured by the defendants in violation of the Federal Food, Drug and Cosmetic Act. On June 29, 1970, plaintiff, United States of America and defendants, both requested that the referred to injunction be suspended. However, both parties agreed that the injunction would revert to its full force and effect if defendants were to commit any of the following acts:

(1) that the methods used in and the facilities and controls used by the defendants for the manufacture processing, packing and holding of drugs do not conform to and are not operated in conformity with current good manufacturing practices; or

(2) that any drug manufactured by the defendants is found by the Government to be adulterated or misbranded within the meaning of the law.

The plaintiff, on February 5, 1971, moved that this Court reinstate the terms of the permanent injunction, alleging that defendants' manufacturing

of drugs did not conform to good manufacturing practices and that drugs manufactured by the defendants were found to be adulterated or misbranded within the meaning of the law.

Evidentiary hearings on the Government's motion were held on May 4, 5 and 6, 1971. On July 28, 1971, defendants filed a Motion for Dismissal alleging lack of jurisdiction under Sections 331 and 332 of Title 21, United States Code.

On the basis of the foregoing, the files and record in the above captioned cause, and after considering the evidence which was introduced by the parties herein, and reviewing the memoranda submitted, and otherwise being duly advised on the premises, the Court makes the following:

## FINDINGS OF FACT

1. That Vitamin K for injection, otherwise known as Menadione Sodium Bisulfite Injection, is listed in the National Formulary.

2. That the National Formulary requires that sterile ampules for injection be packed in such a manner as to prevent contamination or loss of contents.

3. That on November 25, 1970, December 3, 1970 and January 8, 1971, representative samples of ampules of Vitamin K for injection, manufactured by defendants and identified as Lots 70–12 and 70–19, were collected from defendants' finished products storeroom. The ampules were tested by United States Food and Drug Analysts for completeness of closure by visual examination after their immersion in a dye solution. A significant number of the ampules were found to have permitted the dye to become mixed with the drug, showing incomplete closure of the ampules.

4. That on January 15, 1971, a sample consisting of approximately 500 ampules of Vitamin K for injection, manufactured by defendants and bearing the Lot number 7–12, was collected from the Ponce District Hospital. Of those tested for leakage of the drug, 5% were found to allow loss of their contents.

5. Inspection of the Dianovin Pharmaceutical plant by United States Food and Drug Administrators on November 25, 26, 27 and December 3, 1979, revealed numerous deficiencies in the methods, facilities and controls employed by the defendants for the manufacture, processing, packing, labeling and distribution of drugs, including sterile Vitamin K for injection:

(a) batch records for several drugs contained unexplained and unendorsed changes in the amounts of chemicals from that shown on the master formula, failed to indicate the ph measurement of the drug or that such a test was ever performed, failed to make any comparison between theoretic and actual batch yield, did not bear the date of the drug's sterilization.

(b) a number of broken or open windows were found in, or immediately adjacent to, the area in which sterile drugs for injection are produced.

(c) environmental testing for contamination carried out in the drug filling room indicated the presence of as many as sixteen bacterial colonies on days when filling operations for sterile drugs were being carried out, and the firm's records failed to indicate any testing of the filling room during one day of its use.

(d) the defendant, Nicolás O. Cabrero, was observed without a head covering while engaged in the manufacture of a sterile drug for injection.

(e) no system of label accountability exists or is employed in the firm's labeling operations, and loose labels were found lying on shelves in the labeling area. There was no record that printing plates used in the labeling of vials and ampules were examined for accuracy after their receipt from the manufacturers, and a number of ampules of drugs had been left in the manufacturing area identified only by a piece of unattached paper.

6. The batch record of a drug is intended to provide a precise manufacturing history of any particular batch or lot of a drug, and a step by step record of the exact manner and conditions under which that drug was produced, including the amounts and strength of each component, results of both in production and finished product testing, amount of drug actually produced and amount expected to be produced, and the dates on which each step in the process was accomplished. Each separate recording must bear the initials of the individual to insure that the step and its recordation are correct. The absence of any one of the above types of data makes it impossible to assure that errors have not been committed and that the batch of drugs was manufactured, processed, or packed in the proper manner.

7. The physical condition of the building or facility in which drugs are manufactured, processed, packed or held, is a major factor of current good manufacturing practices, especially with respect to sterile drugs for injection. Unless such facilities are adequate and are properly maintained, controls and procedures intended to assure that the drug is free from contamination are likely to be ineffective.

Any broken or open windows in or adjacent to production areas leading to the outside of the building, significantly increase the contamination of the environment and increase the chances of contamination of the filling room and the finished product. Environmental testing of both the filling room and adjacent areas is indicative of the effectiveness of contamination controls, and in the absence of such tests there is no assurance that the atmosphere and any drug filled under these conditions is not contaminated by micro-organisms. The environment of the room in which sterile drugs are filled must be tested on each day in which the drug is filled, and if the tests show more than one bacterial colony, the drug must be destroyed or resterilized. The presence of thirteen colonies on one settling plate evidences that the controls and procedures are of little effect, and that the room is contaminated.

8. Procedures for the labeling of drugs must be such that each label is specifically accounted for both prior and subsequent to the labeling operation for each batch of drugs. Unless such an accountability system is in effect, and labels for use on different drugs or different batches of the same drug are not permitted to be left lying loosely about, an incorrect label may be used. For the same reason, it is essential that batches of drugs are properly identified throughout their production. Identification by means of unattached papers which are easily lost, misplaced or destroyed, does not assure proper identification. And, where label printing plates are used to print the label directly onto the ampules, unless the plates are examined for accuracy prior to use and a record made of such examination, there can be no assurance that the label will not contain an error.

In view of the above Findings of Fact, the Court makes the following:

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over the subject matter herein and of all persons or parties hereto, pursuant to Paragraph 1 of the Order of Permanent Injunction, dated February 17, 1969, and to the Order of Suspension, dated June 29, 1970. Section 332 of Title 21, United States Code, grants the district courts of the United States jurisdiction over violations of Section 331 of the Federal Food, Drug and Cosmetic Act, Title 21, United States Code. Subparagraph (b) prohibits the adulteration or misbranding of any food, drug, device or cosmetic in interstate commerce. Defendants allege that since the product that they manufacture is sold only locally within the Commonwealth of Puerto Rico, they are not engaged in interstate commerce. Defendants concede in their Brief in Support of Motion for Dismissal that the raw material Vitamin K uti-

lized in the production of Vitamin K injectable, is received from outside Puerto Rico. It is enough that the active ingredient of a drug be shipped in interstate commerce to satisfy the interstate commerce requirement of the Federal Food, Drug and Cosmetic Act. Palmer v. United States, 340 F.2d 48 (5 Cir., 1964); United States v. Detroit Vital Foods, Inc., 330 F.2d 78 (6 Cir., 1964); United States v. 40 Cases . . .., 289 F.2d 343 (2 Cir., 1961).

■ 2. Vitamin K, or Menadione Sodium Bisulfite Injection, manufactured by defendants, is a drug within the meaning of Section 321(g), Title 21, United States Code, since it is included in the National Formulary.

■ 3. Under the provisions of 21 United States Code 352(g), a drug is deemed to be misbranded if it purports to be a drug the name of which is recognized in an official compendium, unless it is packaged as prescribed in such compendium. Vitamin K for injection is such a drug recognized in the National Formulary. Ampules of lots 70–12 and 70–19 of Vitamin K for injection, manufactured by the defendants were not completely sealed, and the lots are, therefore, in violation of 21 United States Code 352(g) in that they failed to comply with the standard of packaging for sterile drugs for injection prescribed by the National Formulary.

■ 4. Under the provisions of 21 United States Code 351(a) (2) (B), a drug is adulterated if the methods used in, or the facilities and controls used for its manufacturing, processing, packing or holding do not conform to or are not operated or administered in conformity with current good manufacturing practice to assure that such drug meets the requirement of the Act as to safety, and has the identity and strength, and meets the quality and purity characteristics which it purports or is represented to possess. Sections 133.2 to 133.14 of 21 C.F.R., define and interpret the meaning of "good manufacturing practices". Said regulations contain the criteria for determining whether the methods used in, or the facilities or controls used for, the manufacture, processing, packing, or holding of a drug conform to or are operated or administered in conformity with current good manufacturing practice. United States v. Bel-Mar Laboratories, Inc., 284 F.Supp. 875, at 883 (D. C.N.Y.1968). We find that defendants, on various grounds, have violated Section 331, Title 21 United States Code, as defined in Section 351(a) (2) (B) and 21 C.F.R. 133.2–133.14.

■■ 21 C.F.R. 133.3, requires that buildings in which drugs are manufactured be maintained clean and contain adequate bacteriological controls. It is evident that defendants did not comply with this requirement since as many as sixteen bacterial colonies were found to have existed in the defendants' filling room on days when filling operations were carried out. The fact that several broken windows were found in or immediately adjacent to areas in which sterile drugs are produced, also adequately substantiates the Government's claim. The expert testimony presented by plaintiffs, reveals the seriousness of these two violations. As few as one bacterial colony present in an area where drugs are produced, would justify the destruction of a lot produced under those conditions. The physical integrity of a building constitutes a primary barrier against bacteria. Broken windows permit bacteria to easily overcome this defense line.

■ Sections 133.7(a) (3) and 133.-7(b) (1), requires that master formula records be prepared for each drug product and that a complete batch formula be produced from the master formula record for each batch of product to be produced. Several of defendants' batch records contained unexplained and unendorsed changes in the amounts of chemicals from that shown on the master formula.

■ Defendants also failed to make any comparison between theoretic and actual batch yield. Sections 133.7(a) (3) and 133.8(f), clearly establish that

this practice does not conform to the good manufacturing practices definition of the Federal Food, Drug and Cosmetic Act.

■ Defendant Cabrero was observed without a head covering while engaged in the manufacture of a sterile drug for injection. Section 133.6, 21 concededly requires that components used in the manufacture of drugs be handled in such a way as to prevent contamination. There is ample expert testimony in the record to conclude that it is essential that personnel involved in the mixing and production of sterile drugs must wear head covers, since hair constitutes one of the body's protective agents against bacteria, by collecting bacteria and thus constituting a possible source of contamination in the mixing and production aspects of the manufacture of sterile drugs.

■ Defendants failed to record the measurement of the P.H. factor in the manufacture of liquid products or to detail what measures they undertook to control, eliminate or otherwise deal with it in the batch sheets. The P.H. factor is a measurement of hydrogen iron concentration which is essential since P.H. may affect the characteristics of the drug. This is also a violation of Section 133.7 which requires a complete detail in the batch sheets of the important steps in the manufacturing process of finished pharmaceuticals.

■ Maintaining a complete record of the steps involved in sterilizing drugs is an essential element in the production and manufacture of sterile parenteral drugs. Defendants omitted to include in their batch records, the dates on which sterilization of the drugs they manufacture were carried out. On one occasion the firm's records failed to indicate any testing of the filling room for sterility during one day of its use. Both these incidents constitute violations of Sections 133.7 and 133.6 which require that records be maintained to cover the essential elements or steps in the manufacturing process.

■ There is sufficient evidence to establish that defendants maintained no system of label accountability, that loose labels were found lying on shelves in the labeling area, and that at least, on one occasion a number of ampules of drugs had been left in the manufacturing area identified only by a piece of unattached paper. It was also found that no record that printing plates used in the labeling of vials and ampules were examined for accuracy after their receipt from the manufacturer. All these facts do not conform to the good manufacturing practices contained in Section 133.10, 21 C.F.R., with respect to packaging and labelling, and in Section 133.8(b), which requires that drugs be stored and handled in such a way as to prevent mixups with other drugs.

5. We hereby find, therefore, that drugs manufactured by the defendants are both adulterated and misbranded in violation of the law, and not manufactured, processed, packed and held in conformity with current good manufacturing practices.

It is, therefore, ordered, that this Court's Order suspending the terms and conditions of the Permanent Injunction, dated June 29, 1970, is vacated, and the Order of Permanent Injunction shall revert to its full force and effect.

It is, therefore, further ordered, as follows:

1.—That the defendants, Dianovin Pharmaceuticals, Inc., a corporation, and Nicolás O. Cabrero Oronoz, an individual, and each and all of their officers, agents, servants, employees, and representatives and any and all other persons in active concert or participation with them or any of them, be perpetually restrained and enjoined from directly or indirectly doing or causing to be done any of the following acts:

A.—introducing and delivering for introduction into interstate commerce, in violation of 21 U.S.C. 331(a), any article of drug manufactured, proc-

essed, packed or labeled by said defendants:

(a) which is adulterated within the meaning of 21 U.S.C. 351(a) (2) (B) in that the methods used in and the facilities and controls used for its manufacture, processing, packing and holding do not conform to and are not operated and administered in conformity with current good manufacturing practice to assure that such drug meets the requirements of the Federal Food, Drug, and Cosmetic Act as to safety and has the identity and strength and meets the quality and purity characteristics which it purports and is represented to possess;

(b) which is adulterated within the meaning of 21 U.S.C. 351(b) in that it purports to be or is represented as a drug the name of which is recognized in an official compendium and its strength differs from or its quality or purity falls below the standard set forth in the official compendium;

(c) which is adulterated within the meaning of 21 U.S.C. 351(c) in that it is not subject to 21 U.S.C. 351(b) and its strength differs from or its purity or quality falls below that which it purports or is represented to possess;

(d) which is misbranded within the meaning of 21 U.S.C. 352(a) in that the statements appearing on the labeling of the article of drug are false and misleading in regard to the identity, strength, purity or quality of the article of drug;

(e) which is misbranded within the meaning of 21 U.S.C. 352(f) (1) in that the labeling of the article of drug fails to bear adequate directions for use and it is not exempt from such requirement since it is a drug subject to the requirements of 21 U.S.C. 353(b) (1) and its labeling fails to bear, as required by regulations 21 C.F.R. 1.-106(b) (3) (i), adequate information for its use under which practitioners licensed by law to administer such drug could use such drug safely and for the purposes for which it was intended; or

(f) which is misbranded within the meaning of 21 U.S.C. 353(b) (4) in that the article of drug is subject to 21 U.S.C. 353(b) (1) and its label fails to bear the statement "Caution: Federal law prohibits dispensing without prescription".

B.—manufacturing, processing, packing, or labeling, in violation of 21 U.S.C. 331(k), any article of drug while held for sale after shipment of one or more of its components in interstate commerce, which act of manufacturing, processing, packing, or labeling, results in such article of drug being adulterated or misbranded as set forth hereinabove in subparagraph (A); and

C.—Introducing and delivering for introduction into interstate commerce, in violation of 21 U.S.C. 331(a), any article of drug manufactured, processed, packed, or labeled at said defendants' plant at Santurce, Puerto Rico, and manufacturing, processing, packing or labeling at said plant, in violation of 21 U.S.C. 331(k), any article of drug while held for sale after shipment of one or more of its components in interstate commerce, unless and until:

(1) methods, facilities and controls for manufacturing, processing, packing, labeling, and holding such article of drug at said plant are established and operated and administered in conformity with good manufacturing practice (21 C.F.R. 133.1–.14), which methods, facilities and controls shall specifically include the following:

(a) receipt of raw materials is properly documented and containers thereof are properly identified;

(b) raw materials and finished products are properly tested for identity, strength, quality and purity;

(c) a quarantine area for raw materials is established and maintained;

(d) master formula records and batch production records are dated

and endorsed by two competent individuals;

(e) batch production records list the batch number;

(f) batch production records are made out for all batches;

(g) action is taken to assure the sterility of all parenteral drugs including adequate sterility testing thereof;

(h) pyrogen testing is conducted on all products which are required to be pyrogen free;

(i) bacterial plate counts are made of the sterile fill room;

(j) the vial and ampule filling rooms have positive air pressure and are supplied with filtered air;

(k) the vial and ampule filling room openings leading to the outside of the building are closed;

(l) the ceiling of the vial and ampule filling room is made so that it can be sanitized;

(m) gowns used by personnel employed in the vial and ampule filling rooms are autoclaved;

(n) the dressing room for personnel employed in the vial and ampule filling rooms is changed so that such personnell will not be required to enter the vial filling room to get to the dressing room;

(o) the entry of employees into the vial filling room in their street clothes and shoes is discontinued;

(p) the hood used for filling vials is fixed so that it can be sanitized properly;

(q) accountability is made of all labels used in the labeling operations;

(r) stability tests are performed on all products subject to deterioration after manufacture;

(s) lot numbers of the products distributed are listed on the invoices of such products;

(t) reserve samples of the finished products are retained.

(2) duly authorized Food and Drug Inspectors are granted free access to said plant for the purpose of making an inspection of such plant including the building, pertinent equipment, finished and unfinished materials, containers, labeling, and all records relating to the methods used in, and the facilities and controls used for, the manufacture, processing, packing and holding of drugs, and such inspection shows that the established methods, facilities and controls appear to be operated and administered in conformity with current good manufacturing practice, the cost of any such inspection to be borne by the defendants at the rate of $8.00 per hour and fraction thereof per representative for inspectional work, $10.00 per hour and fraction thereof per representative for laboratory and analytical work and $27.00 per day per person for subsistence expenses where necessary; and

(3) all of the drugs manufactured, processed, packed or labeled at said plant at Santurce, Puerto Rico, which are on hand in the possession of the said defendants are either destroyed, reworked, or otherwise brought into compliance with the law under the supervision of the Food and Drug Administration, and all expenses are paid by the said defendants at the rates herein before specified.

2.—That the defendants, Dianovin Pharmaceuticals, Inc., a corporation, and Nicolás O. Cabrero Oronoz, an individual, shall give written notice of the provisions of this decree to each and all of their officers, agents, servants, employees, representatives, and any and all persons now or in the future in active concert or participation with them or any of them who assist or participate in the manufacture and distribution of articles of drug.

3.—That jurisdiction of this court is retained for the purpose of enforcing or modifying this decree for the purpose of granting such additional relief as may hereafter appear necessary or appropriate.