*692 OPINION OF THE COURT
Stanley L. Sklar, J.
Defendants Norman Orentreich, M.D. and Orentreich Medical Group move for an order vacating a medical malpractice panel’s unanimous finding of liability against the defendants, on the ground that the panel erroneously considered evidence on the issue of whether defendants violated the Federal Food, Drug and Cosmetic Act by compounding liquid silicone for injection into plaintiffs face. Since the Act is applicable, the defendants’ motion is denied.
Plaintiff Rosalyn Retkwa first appeared at the defendants’ offices on or about November 15, 1982 suffering from hirsutism in the form of excess hair on the chin and acne vulgaris. The defendants contend that after the plaintiffs options for treatment were explained to her, she was injected with liquid silicone on three occasions: February 21, 1983, March 18, 1983 and April 27, 1983.
The plaintiff subsequently commenced this action by the service, on or about July 17, 1985, of a summons and verified complaint which interposed two causes of action. The first cause of action which sounds in medical malpractice asserts that defendants departed from accepted medical standards by, inter alla, administering contraindicated microdroplet silicone injections to treat her condition. The second cause of action asserts a lack of informed consent.
On or about September 14, 1990 the parties, through their attorneys, presented their arguments to a medical malpractice panel[1] convened pursuant to Judiciary Law § 148-a and 22 NYCRR 202.56. The panel thereafter unanimously recommended a finding of liability on the part of the defendants. The defendants now contend that the panel’s finding was erroneously based solely on the ground that the use of liquid silicone injections violated the Federal Food, Drug and Cosmetic Act (the Act) (21 USC 301 et seq.), a claim raised by the plaintiff before the panel. In support of their contention the defendants submit an affidavit from Dr. Binford, a member of the panel, who states, inter alla, that if the issue of whether the defendants had violated the Act had not been raised, and had the panel’s judicial member not stressed that the Act had been violated, he would have recommended a no liability *693 finding based on the parties’ argument and the medical record.
The defendants now seek to vacate the panel’s findings on the ground that the Act is inapplicable to the facts herein. Specifically, the defendants argue that Dr. Orentreich’s purchase of non-medical-grade base silicone from Dow Chemical in Delaware, which was then allegedly compounded by his staff at a New York laboratory into medical-grade silicone, does not have the requisite contact with interstate commerce to fall within the purview of the Act.
Defendants readily admit that the microdroplet liquid silicone which was compounded by Dr. Orentreich’s staff was a class III "device” without premarket approval and was therefore deemed to be an adulterated device within the meaning of the Act. The defendants allege, however, that the non-medical-grade base silicone which was shipped by Dow Chemical was not such a device when shipped interstate[2] and that therefore the requisite contact with interstate commerce was absent. Defendants further allege that the Act was not intended to regulate physicians within their own practices, whether or not the device being used was approved or adulterated.
The defendants claim that, because the Act is inapplicable, the panel’s finding was erroneous. Defendants therefore claim that when they call the nonjudicial members of the panel to testify at trial to impeach the panel’s finding, an unnecessary element, namely, the Act, will be interjected. Defendants are concerned that testimony from panel members regarding the Act would be unduly prejudicial to them and confusing to the jury. Defendants apparently fear that even if the Trial Judge were to instruct the jury that the Act is inapplicable, the jury might nonetheless disregard the Judge’s instructions, especially since the jury will learn that another Judge, the panel’s judicial member who cannot be called to testify at trial, determined that the Act was applicable. While recognizing that a panel’s finding is rarely set aside, the potential for prejudice in this case would be high if the Act was indeed inapplicable. Accordingly, a determination of its applicability is necessary.
The history of the Act reveals that it was designed to *694 protect consumers who are unable to protect themselves from dangerous drugs, devices, foods and cosmetics. (United States v Sullivan, 332 US 689, 696; United States v Dotterweich, 320 US 277, 280.) The Act is not to be construed restrictively but rather is to be construed in a manner consistent with its purpose of protecting the public. (United States v Dotterweich, supra, at 280; United States v Bacto-Unidisk, 394 US 784, 798, reh denied 395 US 954; United States v Nova Scotia Food Prods. Corp., 568 F2d 240, 246 [2d Cir 1977].)
Section 331 of the Act lists various prohibited acts with respect to, inter alla, devices. For example, subdivision (a), which focuses on the behavior of the sender, proscribes introducing or delivering for introduction into interstate commerce adulterated devices; while subdivision (c), which focuses on the other end of the transaction, prohibits the reception in interstate commerce of adulterated devices "and the delivery or proffered delivery thereof for pay or otherwise.” Subdivision (b) proscribes the adulteration of devices while they are in interstate commerce.
Subdivision (k), upon which the plaintiff relies, bars: "[t]he alteration, mutilation, destruction, obliteration, or removal of the whole or any part of the labeling of, or the doing of any other act with respect to, a food, drug, device, or cosmetic, if such act is done while such article is held for sale (whether or not the first sale) after shipping in interstate commerce and results in such article being adulterated or misbranded. ” (Emphasis added.)
In Sullivan (supra, at 696-697) the Supreme Court held that: "The words of paragraph (k): 'while such article is held for sale after shipment in interstate commerce’ apparently were designed * * * to extend that Act’s coverage to every article that had gone through interstate commerce until it finally reached the ultimate consumer. ” (Emphasis added.) "[I]t 'is not the holding for sale in a technical legal sense which gives rise to the federal jurisdiction * * * but the fact that the channels of commerce have been used.’ ” (Chaney v Heckler, 718 F2d 1174, 1179 [DC Cir 1984], revd on other grounds 470 US 821, citing United States v 10 Cartons, Labeled in Part "Hoxsey”, 152 F Supp 360, 365 [WD Pa 1957].) The focus of subdivision (k) is adulteration or misbranding that occurs while an article is held for sale after shipment in interstate commerce. (United States v Evers, 643 F2d 1043, 1049 [5th Cir 1981].)
It is not necessary under this subdivision to show that a *695 device was adulterated when it left the interstate sender’s hand or that it became adulterated while still in interstate commerce. Nor is there a necessity to show any wrongful motive or intent on the part of the sender. Indeed, it is not even necessary that the individual or entity receiving the article in interstate commerce be involved in the misbranding or adulteration. (United States v Evers, supra, at 1050.) Rather, it is sufficient if the device was held for sale after shipment in interstate commerce and then was adulterated.
A device is "held for sale” within the meaning of the Act if it is, inter alla, held by a practitioner for treatment of patients. (United States v Diapulse Corp., 514 F2d 1097, cert denied 423 US 838; United States v Evers, 643 F2d 1043, supra.)
Defendants’ assertion that the non-medical-grade base silicone which was shipped interstate by Dow is not a device within the meaning of the Act is without merit. 21 USC § 321 (h) defines a "device” as:
"an instrument, apparatus, implement, machine, contrivance, implant, in vitro reagent, or other similar or related article, including any component, part, or accessory which is
"(1) recognized in the official National Formulary, or the United States Pharmacopeia, or any supplement to them,
"(2) intended for use in the diagnosis of disease or other conditions, or in the cure, mitigation, treatment, or prevention of disease, in man or other animals, or
"(3) intended to affect the structure or any function of the body of man or other animals ” (emphasis added).
It is readily apparent from the definition of the word "device” that it applies to any component of a device which was intended to affect the structure or functions of the body. Clearly defendants intended such result when the base silicone was ordered from Dow and when they compounded it and injected it. Moreover, analogous case law involving drugs supports the conclusion that the base silicone falls within the reach of the statute. For example, in United States v Dianovin Pharms. (475 F2d 100 [1st Cir 1973], cert denied 414 US 830), the appeals court upheld the District Court’s determination (342 F Supp 724) that a drug manufacturer’s use of the raw material vitamin K, which had been shipped in interstate commerce, in making the drug injectable vitamin K, solely for local consumption fell within the Act since articles intended *696 for use as components of a drug were also defined as drugs under 21 USC § 321 (g) (1) (D).
Since doctors holding devices are considered but one part of the distribution process, and since the non-medical-grade silicone, received by Orentreich and administered to the plaintiff, the "ultimate consumer,” was a device within the meaning of the Act and was adulterated while being "held for sale,” defendants’ arguments that their actions do not have the requisite contact with interstate commerce so as to fall within the purview of the Act must fall.
The defendants further urge that Congress did not intend that the Act interfere with the practice of medicine or prohibit the use by a physician of any product whether or not it was approved or adulterated. The defendants attempt to support their argument with case authority but a review of the cases cited reveals that the physicians in those cases were using approved drugs for unapproved uses. (See, e.g., Chaney v Heckler, 718 F2d 1174, revd on other grounds 470 US 821, supra; United States v Evers, supra.) Indeed, I could find no authority for the proposition that the Act was inapplicable to physicians using a drug or device which was never approved for any purpose.
The defendants are correct in asserting that the Act’s legislative history indicates an intention not to interfere in the legal practice of medicine by a physician. The Food and Drug Administration (FDA), in a notice of proposed rule making issued in 1972 which acknowledged the Act’s legislative history, explained:
"Once [an approved] new drug is in a local pharmacy after interstate shipment, the physician may, as part of the practice of medicine, lawfully prescribe a different dosage for his patient, or may otherwise vary the conditions of use from those approved in the package insert, without informing or obtaining the approval of the Food and Drug Administration.
"This interpretation of the Act is consistent with Congressional intent as indicated in the legislative history of the 1938 Act and the drug amendments of 1962. Throughout the debate leading to the enactment, there were repeated statements that Congress did not intend the Food and Drug Administration to interfere with medical practice and references to the understanding that the bill did not purport to regulate the practice of medicine as between the physician and the patient. Congress recognized a patient’s right to seek civil damages in the *697 courts if there should be evidence of malpractice, and declined to provide any legislative restrictions upon the medical profession.” (37 Fed Reg 16503.)
The FDA did go on to state, however, that, although it was not intended to oversee the practice of medicine, it certainly was intended to control which drugs were made available to physicians. (Id., at 16504; United States v Evers, supra, at 1048; United States v Algon Chem., 879 F2d 1154, 1161 [3d Cir 1989].)
In Chaney (supra, at 1180), the United States Court of Appeals for the District of Columbia opined that: "The better explanation for the practice-of-medicine exemption is that Congress did not want to interfere with physicians’ treatment of their patients. New uses for drugs are often discovered after FDA approves the package inserts that explain a drug’s approved uses. Congress would have created havoc in the practice of medicine had it required physicians to follow the expensive and time-consuming procedure of obtaining FDA approval before putting drugs to new uses [footnote omitted]. Thus Congress excepted the practice of medicine from the Act so as not to limit a physician’s ability to treat his patients [footnote omitted].”
In United States v Algon Chem. (supra, at 1163), the United States Court of Appeals for the Third Circuit concluded that Congress intended nothing more than to preserve a physician’s right to compound and prepare medicines which were legally obtained during the course of the physician’s medical practice. The court, in a footnote, observed that in a debate held in 1935 concerning a proposed amendment to the Act, Senator Copeland stated that " '[tjhere is nothing in the [Act] which would interfere at all with the ordinary legal practice of the profession.’ ” (Supra, at 1159, n 4 [emphasis added].) The court then went on to conclude that the medical-practice exemption to the Act could not, and was not intended to, protect a physician’s preparation of an unapproved illegal drug. I agree with this conclusion.[3]
In summation, I find that defendants’ conduct in preparing and administering the silicone injections to the plaintiff falls *698 within the "held for sale” provision of 21 USC § 331 (k) and therefore has the requisite contact with interstate commerce to come within the operation of the Act. Further, the medical-practice exception to the Act does not pertain to a physician’s compounding of an unapproved or illegal substance as any contrary result would defeat the intent of the protections afforded by the Act. Accordingly, the defendants’ motion is denied.

. The panel consisted of Robert Throne Binford, M.D., a dermatologist, Jeffrey B. Bloom, Esq. and Alexander Chananau, the panel’s judicial member. (See, Judiciary Law § 148-a [2].)

. There is no dispute that the non-medical-grade silicone manufactured by Dow Chemical Corporation was shipped to the defendants from without New York State.

. I note without deciding that it may be that the defendants’ actions in manufacturing and holding for sale an adulterated device (Education Law § 6802 [16]) constitute violations of New York law (see, Education Law § 6811 [9]) which law is in many respects similar to the Act. It further appears that physicians do not seem to be exempt from such violations (see generally, Education Law § 6807).