The STATE OF OKLAHOMA, By and Through Larry DERRYBERRY, Attorney General of the State of Oklahoma; David L. Boren, Governor of the State of Oklahoma; the State of Texas, by and through John L. Hill, Attorney General of the State of Texas; Dolph Briscoe, Governor of the State of Texas; the State of Louisiana, by and through William J. Guste, Jr., Attorney General of the State of Louisiana; Edwin Edwards, Governor of the State of Louisiana; Shirley McNamara, Secretary of the Louisiana Department of Revenue and Taxation; and William C. Huls, Secretary of the Louisiana Department of Natural Resources, Plaintiffs-Appellants,

The State of Wyoming, by and through its Attorney General; Ralph L. Harvey, individually and as president of Marlin Oil Corporation, Intervenors-Appellants,

v.

FEDERAL ENERGY REGULATORY COMMISSION, Defendant-Appellee,

United States of America, Intervenor-Appellee.

Nos. 80–1748, 80–1824.

United States Court of Appeals, Tenth Circuit.

Argued and Submitted July 16, 1981.

Decided Sept. 22, 1981.

Lino A. Graglia, Austin, Tex. (William Pannill and Gary W. Catron of Pannill & Hooper, Houston, Tex., Mark White, Atty. Gen., John W. Fainter, Jr., First Asst. Atty. Gen., James R. Meyers, Gayle Johnson Cipriano, Andrew Kever and Stuart Fryer, Asst. Attys. Gen., State of Tex., Austin, Tex., Jan Eric Cartwright, Atty. Gen., and John F. Percival, Asst. Atty. Gen., State of Okl., Oklahoma City, Okl., William J. Guste, Jr., Atty. Gen., Carmack M. Blackmon and Gary L. Keyser, Asst. Attys. Gen., State of La., Mary Ellen Leeper, Sp. Counsel, Baton Rouge, La., John D. Troughton, Atty. Gen., and Thomas J. Carroll, III, Asst. Atty. Gen., State of Wyo., Cheyenne, Wyo., with him on the brief), for plaintiffs-appellants and intervenors-appellants.

Jerome Nelson, Acting Gen. Counsel, Federal Energy Regulatory Commission, and Bruce G. Forrest, Atty., Dept. of Justice, Washington, D.C. (Jerome M. Feit, Deputy Sol., J. Paul Douglas, Asst. Sol., and Joanne Leveque, Atty., Federal Energy Regulatory Commission, Thomas S. Martin, Acting Asst. Atty. Gen., Robert S. Greenspan, Dina R. Lassow and Paul A. Gaukler, Attys., Civ. Div., Dept. of Justice, Washington, D.C., with him on the brief), for defendant-appellee and intervenor-appellee.

Before BARRETT, DOYLE and McKAY, Circuit Judges.

BARRETT, Circuit Judge.

This case involves a constitutional challenge to the Natural Gas Policy Act of 1978, 15 U.S.C.A. § 3301 *et seq.* (Supp. 1979), (NGPA or Act).

The States of Oklahoma, Texas and Louisiana initiated this action against the Federal Energy Regulatory Commission (FERC) seeking a declaratory judgment holding the Act to be unconstitutional insofar as it applies to wholly intrastate gas, impairs the ability of the states to function effectively in a federal system, and forces and coerces the states to administer a federal regulatory scheme. Within its answer FERC moved to dismiss certain claims and for summary judgment.

The State of Wyoming and Ralph L. Harvey[1], individually and as president of Marlin Oil Corporation, an Oklahoma corporation engaged in the exploration for and production and sale of natural gas in Oklahoma, were permitted to intervene as parties plaintiff. The United States of America[2] was also permitted to intervene as a party defendant.

The district court denied FERC's motion to dismiss and States' motion for summary judgment, but granted FERC's motion for summary judgment upholding the constitutionality of the Act in all respects.[3] A brief history of the Act and the prior regulation of the natural gas industry will facilitate our review.

Natural gas was first regulated in 1938 with the enactment of the Natural Gas Act of 1938 (NGA), 15 U.S.C.A. §§ 717 *et seq.*,

---

1. Hereinafter, for convenience, collectively referred to, with the States of Oklahoma, Texas and Louisiana, as States.

2. Hereinafter collectively referred to, with FERC, as FERC.

3. Reported below at 494 F.Supp. 636 (W.D.Okl. 1980).

which regulated the transportation and sale of natural gas in interstate commerce. Under the NGA the Federal Power Commission[4] regulated interstate natural gas pipelines and, following the decision of the Supreme Court in *Phillips Petroleum Co. v. Wisconsin*, 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed.2d 1035 (1954), regulated the wellhead price of gas sold for resale in interstate commerce. Wholly intrastate gas, *i. e.*, gas produced, sold and consumed within a state, was not regulated under NGA. This resulted, generally, in higher prices of intrastate gas.

Under NGA, two separate natural gas markets developed, a regulated interstate market and an unregulated intrastate market. Bifurcation of the natural gas market did not, until the late 1960's and early 1970's, create serious market disorders, because supply exceeded demand and new reserve additions exceeded annual production. H.R.Rep.No. 95–496, Part IV, 95th Cong. 1st Sess., 90 (1977). It was, however, during the late 1960's and early 1970's that Congress became intimately aware of the market distortions created by the bifurcated market as the price disparity between interstate and intrastate gas increased substantially. This prompted many producers to sell their production in the intrastate, rather than interstate market, resulting in shortages of natural gas in nonproducing states, and thereby resulting in the intrastate market securing the majority of new production. "The NGPA was Congress' solution to the necessity of encouraging production and exploration of new natural gas sources and maintaining adequate supplies of natural gas in the interstate market." [494 F.Supp. at p. 645].

The provisions of NGPA, insofar as they are relevant for purposes of this appeal, include: Title I, which establishes price ceilings for all first sales of natural gas irrespective of its interstate or intrastate character; Title II, which provides for a pass-through of the costs incurred by interstate pipelines to industrial users and which, while not applicable to intrastate pipelines, prohibits the States from enacting or enforcing any conflicting regulations; Title IIIB, which authorizes sales between interstate and intrastate pipelines in accordance with certain non-discriminatory contractual requirements imposed by FERC; and Title V, which provides for the administration of the Act.

The States' complaint, as amended and supplemented, contended, *inter alia*: the Act is unconstitutional in that all the provisions which purport to affect intrastate gas exceed the power of Congress to regulate commerce among the several states and abrogate the Tenth Amendment as well as being a denial of equal protection and due process (Count I); the provisions of the Act which "attempt to coerce plaintiffs" into enactment of legislation, assignment of state employees, and the expenditure of state funds for the implementation of federal policy are an invasion of state sovereignty and intergovernmental immunity, violative of the Tenth Amendment guarantees and in excess of Congress' Commerce Clause power (Count II); the provisions of the Act which authorize the allocation and distribution of intrastate gas into interstate pipelines exceed Congress' Commerce Clause power and invade state sovereignty and immunity as provided in the Tenth Amendment, equal protection, and due process clauses (Count IV).

Intervening plaintiff State of Wyoming raised substantially the same issues. Intervening plaintiff Ralph Harvey attacked the regulation of intrastate gas as exceeding Congress' Commerce Clause power and further alleged that certain pricing provisions of the Act were unconstitutional.

In granting summary judgment in favor of FERC and upholding the constitutionality of the Act in all respects, the trial court found/concluded, *inter alia*: Congress may regulate activities which are wholly intrastate when the intrastate activity either has a substantial economic effect on interstate commerce or where federal regulation of the intrastate activity is necessary to effec-

---

**4.** Predecessor to FERC.

tuate the interstate regulation; in assessing a challenge to Congress' regulation of intrastate commerce a court must determine whether Congress had a rational basis for determining that the unregulated intrastate gas market affected interstate commerce and, if so, whether the means selected by Congress were reasonably adapted to eliminating the burden; Congress had a rational basis for determining that the unregulated intrastate market imposed a burden on interstate commerce; the regulatory scheme adopted by Congress is reasonably adopted to eliminating the burden on interstate commerce; the enactment of the Act was within the constitutional congressional power; the enactment of the Act was not in violation of the constitutional doctrine of intergovernmental immunity; the States have failed to establish that the implementation of the Act will severely reduce state revenues; the power to regulate natural gas is not a traditional state function from which Congress is prohibited from interfering; Congress may pre-empt state conservation regulations which interfere with or burden interstate commerce; Congress may delegate certain administrative duties to administrative agencies, federal or state; the States, while authorized to administer the Act, are not coerced into administering the Act since no sanctions are levied in the event a state agency refuses to act; although the Act does impose both revenue reducing regulations and the cost of their administration upon certain natural gas producing states, there can be no violation of the Tenth Amendment or equal footing doctrine, inasmuch as the Act does not command any State action, and the States are free to refuse to act, thus avoiding payment for administration.

On appeal, States contend: (1) "Congress is without constitutional authority under the Commerce Clause to set maximum prices on natural gas not sold in interstate commerce or in competition with interstate natural gas in any market solely on the ground that such sales are wholly intrastate and in order to compel them to *become* interstate"; (2) NGPA's imposition of maximum prices on intrastate sales of natural gas, even if an otherwise valid exercise of Congress' Commerce Clause authority, is prohibited by the constitutional doctrine of intergovernmental immunity; and (3) NGPA unconstitutionally coerces States to implement a federal regulatory program with their own agencies, personnel and resources and to restructure their regulatory agencies and appellate procedures.

I.

States contend that Congress is without constitutional authority under the Commerce Clause to set maximum prices on intrastate gas and that even if such pricing could be considered valid under the Commerce Clause, it is prohibited by the constitutional doctrine of intergovernmental immunity.

In assessing the ability of Congress to set maximum prices on intrastate natural gas sales, the District Court observed:

It is now beyond argument that Congress may regulate activities which are wholly intrastate when the intrastate activity either has a substantial economic effect on interstate commerce or where federal regulation of the intrastate activity is necessary to effectuate interstate regulation. See, e. g., *Fry v. United States*, 421 U.S. 542, 95 S.Ct. 1792, 44 L.Ed.2d 363 (1975); *Daniel v. Paul*, 395 U.S. 298, 89 S.Ct. 1697, 23 L.Ed.2d 318 (1969); *Katzenbach v. McClung*, 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964); *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964). Such power includes regulation of prices of intrastate products and activities. *Wickard v. Filburn*, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942); *United States v. Wrightwood Dairy Co.*, 315 U.S. 110, 62 S.Ct. 523, 86 L.Ed. 726 (1942); *Houston, East & West Texas Railway v. United States*, 234 U.S. 342, 34 S.Ct. 833, 58 L.Ed. 1341 (1914). This Court's role in assessing the present challenge to Congress' regulation of intrastate commerce is limited to a determination of two factors—whether Congress had a rational basis for determining that

the unregulated intrastate gas market affected interstate commerce, and, if so, whether the means selected by Congress were reasonably adapted to eliminating the burden. *Arizona Public Service Co. v. Snead*, 441 U.S. 141, 99 S.Ct. 1629, 60 L.Ed.2d 106 (1979); *Perez v. United States*, 402 U.S. 146, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1972); *Heart of Atlanta Motel, Inc. v. United States*, supra; *Katzenbach v. McClung*, supra. In determining whether a rational basis exists for the finding of burden on interstate commerce, the Court may not substitute its judgment for that of Congress, but must look at the legislative history and the acts and testimony before Congress. If "a rational basis for finding a chosen regulatory scheme necessary to the protection of commerce [is found], our investigation is at an end." *Katzenbach v. McClung*, supra, 379 U.S. at 303–04, 85 S.Ct. at 383. 494 F.Supp. at pp. 653–654. [Footnotes omitted].

After finding that Congress did, indeed, have a rational basis for determining that the unregulated intrastate gas market affected interstate commerce and that the means (NGPA) selected by Congress were reasonably adopted to eliminate the burden, the District Court addressed States' contention that the pricing of intrastate gas was violative of the constitutional doctrine of intergovernmental immunity:

> While enactment of the NGPA is within constitutional congressional commerce power, the inquiry is not at an end. In *National League of Cities v. Usery*, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), the Supreme Court held that the power to legislate pursuant to the Commerce Clause is limited by the constitutional doctrine of intergovernmental immunity, i. e., Congress may not interfere with state sovereignty, even under the guise of otherwise permissible Commerce Clause power. The test enunciated in *National League of Cities* is whether Congress impinges upon the sovereign power of the "state qua state" in performing essential governmental functions. The Court listed examples of traditional state operations (a typical but not exhaustive list) as fire and police protection, sanitation, public health, and parks and recreation.

\* \* \* \* \* \*

> Secondly, and most importantly, the power to regulate gas produced and sold intrastate is not the type of "traditional state function" from which Congress is prohibited from interfering under *National League of Cities*. It is not the states' roles as providers of roads, education, and similar traditional state functions which is infringed by the Act, but, if anything, their choice of methods by which to fund such functions. The distinction is essential. Under the NGA, the Supreme Court has rejected an argument that impairment of state revenues must be considered. *In Re Permian Basin Area Rate Cases*, 390 U.S. 747, 822 n. 114, 88 S.Ct. 1344, 1389 n. 114, 20 L.Ed.2d 312 (1968); *FPC v. Hope Gas Co.*, 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944). While the impact on individual state treasuries is a critically important factor for the Congress to consider, the constitutionality of the Act is not necessarily dependent on it. If the financial impact on the functioning of the governmental bodies involved were so severe as to impair the states' ability to function effectively in a federal system, as in *National League of Cities*, then it could be said that the impact and intrusion threatens the states' separate and independent existence. *Coyle v. Oklahoma*, 221 U.S. 559, 31 S.Ct. 688, 55 L.Ed. 853 (1911). Such is not the case here. Federal regulation which has an indirect effect on state treasuries is not the same impermissible intrusion on state sovereignty found in *National League of Cities*. See *Public Service Co. v. FERC*, 587 F.2d 716 (5th Cir. 1979), cert. denied 444 U.S. 879, 100 S.Ct. 166, 62 L.Ed.2d 108.

494 F.Supp. at pp. 656–657.

We hold that the District Court properly concluded that Congress acted within its powers in enacting legislation to

effectuate setting maximum prices on intrastate gas and that such pricing is not prohibited by the doctrine of intergovernmental immunity. In our view, the District Court's analysis in assessing the validity of Congress' enactment of the NGPA vis-a-vis a constitutional challenge predicated on the legal efficacy of the Commerce Clause, closely parallels a similar discussion in *Hodel v. Virginia Surface Mining*, —— U.S. ——, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981). There the constitutionality of the Surface Mining and Reclamation Control Act of 1977[5] was upheld, and the Court observed:

> The task of a court that is asked to determine whether a particular exercise of congressional power is valid under the Commerce Clause is relatively narrow. The court must defer to a congressional finding that a regulated activity affects interstate commerce, if there is any rational basis for such a finding. *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 258, 85 S.Ct. 348, 358, 13 L.Ed.2d 258 (1964); *Katzenback v. McClung*, 379 U.S. 294, 303–304, 85 S.Ct. 377, 383, 13 L.Ed.2d 290 (1964). This established, the only remaining question for judicial inquiry is whether "the means chosen by [Congress] is reasonably adapted to the end permitted by the Constitution." *Heart of Atlanta Motel, Inc. v. United States, supra*, 379 U.S. at 262, 85 S.Ct. at 360. See *United States v. Darby*, 312 U.S. 100, 121, 61 S.Ct. 451, 460, 85 L.Ed. 609 (1941); *Katzenbach v. McClung, supra*, 379 U.S. at 304, 85 S.Ct. at 383. The judicial task is at an end once the court determines that Congress acted rationally in adopting a particular regulatory scheme. *Ibid.*

> Judicial review in this area is influenced above all by the fact that Commerce Clause is a grant of plenary authority to Congress. See *National League of Cities v. Usery*, 426 U.S., at 840, 96 S.Ct., at 2468; *Cleveland v. United States*, 329 U.S. 14, 19, 67 S.Ct. 13, 15, 91 L.Ed. 12 (1946); *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 37, 57

S.Ct. 615, 624, 81 L.Ed. 893 (1937). This power is "complete in itself, may be exercised to its utmost extent, and acknowledges no limitations, other than are prescribed in the constitution." *Gibbons v. Ogden*, 22 U.S. 1, 9 Wheat. 1, 196, 6 L.Ed. 23 (1824). Moreover this Court has made clear that the commerce power extends not only to "the use of channels of interstate or foreign commerce" and to "protection of the instrumentalities of interstate commerce . . . or persons or things in commerce," but also to "activities affecting commerce." *Perez v. United States*, 402 U.S. 146, 150, 91 S.Ct. 1357, 1359, 28 L.Ed.2d 686 (1971). As we explained in *Fry v. United States*, 421 U.S. 542, 547, 95 S.Ct. 1792, 1795, 44 L.Ed.2d 363 (1975), "[e]ven activity that is purely intrastate in character may be regulated by Congress, where the activity, combined with like conduct by others similarly situated, affects commerce among the States or with foreign nations." See *National League of Cities v. Usery, supra*, 426 U.S. at 840, 96 S.Ct. at 2468, *Heart of Atlanta Motel, Inc. v. United States, supra*, 379 U.S. at 255, 85 S.Ct. at 356; *Wickard v. Filburn*, 317 U.S. 111, 127–128, 63 S.Ct. 82, 90, 87 L.Ed. 122 (1942); *United States v. Wrightwood Dairy Co.*, 315 U.S. 110, 119, 62 S.Ct. 523, 526, 86 L.Ed. 726 (1942); *United States v. Darby, supra*, 312 U.S. at 120–121, 61 S.Ct. at 460.

Thus, when Congress has determined that an activity affects interstate commerce, the courts need inquire only whether the finding is rational. Here, the District Court properly deferred to Congress' express findings, set out in the Act itself, about the effects of surface coal mining on interstate commerce.

—— U.S. at pp. —— – ——, 101 S.Ct. at p. 2360.

Here, as in *Hodel v. Virginia*, the District Court properly deferred to the express findings of Congress relative to the effects of the intrastate gas market on interstate commerce. Furthermore, here, as in *Hodel*

---

5. 30 U.S.C.A. §§ 1201 *et seq.* (1976 ed., Supp. III).

*v. Virginia,* the District Court likewise considered "the only remaining question for judicial inquiry", *i. e.,* whether "the means chosen by [Congress] is reasonably adapted to the end permitted by the constitution."

States' burden of establishing that the means selected by Congress was not reasonably adapted to the end permitted by the Constitution is a heavy one which States have failed to meet. In *Hodel v. Indiana,* —— U.S. ——, 101 S.Ct. 2376, 69 L.Ed.2d 40 (1981), the Court stated:

Social and economic legislation like the Surface Mining Act that does not employ suspect classifications or impinge on fundamental rights must be upheld against equal protection attack when the legislative means are rationally related to a legitimate governmental purpose. *Schweiker v. Wilson,* 450 U.S. 221, 101 S.Ct. 1074, 67 L.Ed.2d 186 (1981); *U. S. Railroad Retirement Board v. Fritz,* 449 U.S. 166, 101 S.Ct. 453, 66 L.Ed.2d 368 (1980). Moreover, such legislation carries with it a presumption of rationality that can only be overcome by a clear showing of arbitrariness and irrationality. *Duke Power Co. v. Carolina Environmental Study Group,* 438 U.S. at 83, 98 S.Ct. at 2635; *Usery v. Turner Elkhorn Mining Co.,* 428 U.S. at 11, 96 S.Ct. at 2892. As the Court explained in *Vance v. Bradley,* 440 U.S. 93, 97, 99 S.Ct. 939, 942, 59 L.Ed.2d 171 (1979), social and economic legislation is valid unless "the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that [a court] can only conclude that the legislature's actions were irrational."

—— U.S. p. ——, 101 S.Ct. at p. 2386.

We hold that the District Court properly found/concluded that the enactment of NGPA is a constitutionally acceptable exercise of Congress' Commerce Clause power. We also hold that the District Court correctly found that the maximum pricing provisions of the Act are not prohibited by the constitutional doctrine of intergovernmental immunity. *See National League of Cities v. Usery,* 426 U.S. 833 (1976) at p. 851, 96 S.Ct. at p. 2474.

## II.

■ States contend that NGPA unconstitutionally coerces States to implement a federal regulatory program with their own agencies, personnel and resources and to restructure their regulatory agencies and appellate procedures. States argue that NGPA conscripts state agencies to operate a federal program, that NGPA requires producing states to implement the Act, and that enforcement of the Act burdens the states and interferes with their freedom to structure their governments, all in violation of their state sovereignty and the Tenth Amendment.

In addressing these contentions, the District Court observed:

It is no longer questioned that Congress may delegate certain adjudicatory and legislative duties to an administrative agency. There is no indication in any authority provided to or found by the Court that this delegation may not properly be made to a state rather than federal administrative agency. The NGPA does not impose the federal appellate process on a state agency determination, as argued by Harvey. Rather, it makes the state agency determination the first step in the federal administrative chain, delegating to the state agency, providing it consents, the duty of making the initial determination under the Act, with review thereafter in the appropriate federal forum.

Congress has not exceeded the limitation of the Tenth Amendment and the doctrine of intergovernmental immunity in delegating the initial price determination to state agencies. The test, as discussed above, is whether the challenged legislation directly displaces "the States' freedom to structure integral operations in areas of traditional governmental functions." *National League of Cities v. Usery,* supra, 426 U.S. at 852, 96 S.Ct. at 2474.

\* \* \* \* \* \*

The states argue that they are coerced into administering the Act, spending

state funds for the operation of a federal program on behalf of a federal agency. This is contended to be an impermissible intrusion into traditional state functions. *National League of Cities v. Usery*, supra. Defendants respond simply that the states are not coerced to act and that therefore the administrative scheme is constitutional.

The distinction between "coercion" and "permission" is supported in a long line of precedent which holds that the federal government may delegate implementation of federal programs to states willing to comply. These cases arise for the most part from legislation conditioning the grant of federal funds upon the state's compliance with some federal program. Rejection of state sovereignty arguments is on the theory that the state has "the 'simple expedient' of not yielding to what she urges is federal coercion."

494 F.Supp. at pp. 659, 660–661.

A similar standard was set forth by the Supreme Court in *Hodel v. Virginia, supra*, wherein the Court, in assessing a Tenth Amendment challenge to the Surface Mining Control and Reclamation Act of 1977, opined:

It should be apparent from this discussion that in order to succeed, a claim that congressional commerce power legislation is invalid under the reasoning of *National League of Cities* must satisfy *each* of three requirements. First, there must be a showing that the challenged statute regulates the "States as States." *Id.*, at 854, 96 S.Ct. at 2475. Second, the federal regulation must address matters that are indisputably "attributes of state sovereignty." *Id.*, at 845, 96 S.Ct. at 2471. And third, it must be apparent that the States' compliance with the federal law would directly impair their ability "to structure integral operations in areas of traditional functions." *Id.*, at 852, 96 S.Ct. at 2474. When the Surface Mining Act is examined in light of these principles, it is clear that appellees' Tenth Amendment challenge must fail because the first of the three requirements is not satisfied.

\*　　\*　　\*　　\*　　\*　　\*

If a State does not wish to submit a proposed permanent program that complies with the Act and implementing regulations, the full regulatory burden will be borne by the Federal Government. Thus, there can be no suggestion that the Act commandeers the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program.... The most that can be said is that the Surface Mining Act establishes a program of cooperative federalism that allows the States, within limits established by federal minimum standards, to enact and administer their own regulatory programs, structured to meet their own particular needs.

\*　　\*　　\*　　\*　　\*　　\*

Appellees argue, however, that the threat of federal usurpation of their regulatory roles coerces the States into enforcing the Surface Mining Act. Appellees also contend that the Act directly regulates the States as States because it establishes mandatory minimum federal standards. In essence, appellees urge us to join the District Court in looking beyond the activities actually regulated by the Act to its conceivable effects on the States' freedom to make decisions in areas of "integral governmental functions." And appellees emphasize, as did the court below, that the Act interferes with the States' ability to exercise their police powers by regulating land use.

Appellees' claims accurately characterize the Act insofar as it prescribes federal minimum standards governing surface coal mining, which a State may either implement itself or else yield to a federally administered regulatory program. To object to this scheme, however, appellees must assume that the Tenth Amendment limits congressional power to pre-empt or displace state regulation of private activities affecting interstate commerce. This assumption is incorrect.

A wealth of precedent attests to congressional authority to displace or pre-empt state laws regulating private activi-

**840**

ty affecting interstate commerce when these laws conflict with federal law.

— U.S. at p. —, 101 S.Ct. at p. 2367. [Footnote omitted].

As in *Hodel v. Virginia*, the NGPA simply allows the states to participate in the administration of the Act. There, as here, "[i]f a State does not wish to submit a proposed permanent program . . ., the full regulatory burden will be borne by the Federal Government." In view of the right of Congress to displace or pre-empt state laws regulating private activity affecting interstate commerce when they conflict with federal laws, we hold that the District Court correctly found that the Act is not in violation or degradation of States' Tenth Amendment right.

We commend the District Court for an excellent Memorandum Opinion. *See* 494 F.Supp. 636.

WE AFFIRM.

